UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MELVIN WILLIAMS,

                    Petitioner,                    Case No. 1:03-cv-270

v.                                             Honorable Gordon J. Quist

MARY BERGHUIS,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner was convicted in the Muskegon County Circuit Court of assault with intent to commit murder, MICH. COMP. LAWS § 750.83; assault with intent to commit armed robbery, MICH. COMP. LAWS § 750.89; discharging a firearm at a dwelling, MICH. COMP. LAWS § 750.234b; and two counts of felony firearm, MICH. COMP. LAWS § 750.227b.   On August 3, 2000, the trial court sentenced Petitioner as a fourth habitual offender, to prison terms of 25-40 years for each assault conviction, 2-15 years for discharging a firearm in a dwelling, together with consecutive 2-year prison terms for each of the felony firearm convictions.  In his amended *pro se* petition (docket #10), Petitioner raises eight grounds for relief, as follows:

    1.      PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE [PETITIONER] WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW IN VIOLATION OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION WHERE THE PROSECUTOR FAILED TO PRODUCE SUFFICIENT EVIDENCE AT TRIAL TO SUSTAIN A JURY VERDICT OF GUILT BEYOND A REASONABLE DOUBT OF THE OFFENSES OF: ASSAULT WITH INTENT TO COMMIT MURDER, ASSAULT WITH INTENT TO

COMMIT ARMED ROBBERY, DISCHARGING A FIREARM IN A DWELLING, AND TWO COUNTS OF FELONY FIREARM.

2.    PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE [UNITED] STATES CONSTITUTION WHERE THE PROSECUTION KNOWINGLY AND DELIBERATELY USED PERJURED EVIDENCE TO CONVICT HIM.

3.    PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE [PETITIONER] WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN THE TRIAL COUNSEL FAILED TO OBJECT TO THE PROSECUTOR'S FAILURE TO PRODUCE SUFFICIENT EVIDENCE AT TRIAL TO SUSTAIN A JURY'S VERDICT OF GUILT BEYOND A REASONABLE DOUBT TO THE CHARGED OFFENSES AND KNOWINGLY AND DELIBERATELY USED PERJURED EVIDENCE TO CONVICT.

4.    PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE [PETITIONER] WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN APPELLANT COUNSEL FAILED TO RAISE THE PROSECUTOR'S FAILURE TO PRODUCE SUFFICIENT EVIDENCE AT TRIAL TO SUSTAIN A JURY VERDICT OF GUILT BEYOND A REASONABLE DOUBT TO THE [CHARGED] OFFENSE AND KNOWINGLY AND DELIBERATELY USING PERJURED EVIDENCE TO CONVICT, THESE WERE COLORABLE ISSUES IN [PETITIONER'S] APPEAL OF RIGHT WHICH DEPRIVED [PETITIONER OF] A FULL AND FAIR REVIEW OF ALL COLORABLE ISSUES ON APPEAL.

5.    PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE [PETITIONER] HAS ESTABLISHED THE REQUISITE "CAUSE" AND "PREJUDICE" REQUIRED UNDER MCR 6.503(D)(3)(a)-(b) TO EXCUSE THE PROCEDURAL DEFAULT THAT OCCURRED WHEN TRIAL AND APPELLATE COUNSEL FAILED TO RAISE ALL MERITORIOUS ISSUES IN [PETITIONER'S] APPEAL OF RIGHT.

6.    PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE [PETITIONER'S] DUE PROCESS RIGHTS TO A FAIR TRIAL, TO PREPARE A DEFENSE, AND TO FULL DISCOVERY WERE VIOLATED WHEN OVER OBJECTION THE COURT ADMITTED A STATEMENT ALLEGEDLY WRITTEN BY [PETITIONER] TO THE OFFICER IN CHARGE WHICH WAS UNDISCLOSED TO DEFENSE COUNSEL UNTIL THE DAY THE TRIAL COMMENCED.

7. PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE [PETITIONER] RECEIVED THE INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL FOR COUNSEL'S FAILURE TO PURSUE MEANINGFUL DISCOVERY AND FOR FAILING TO SEEK AN ADJOURNMENT WHEN CRITICAL EVIDENCE OF A STATEMENT MADE BY [PETITIONER] WAS DISCLOSED ON THE FIRST DAY OF TRIAL.

8. PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTOR TO CALL A REBUTTAL WITNESS TO OFFER TESTIMONY ON AN IRRELEVANT AND COLLATERAL MATTER TO TRIAL.

Respondent has filed an answer to the petition (docket #17) stating that the grounds should be denied because petitioner's claims are procedurally defaulted or without merit. Petitioner filed a reply (docket # 34) Upon review and applying the AEDPA standard, I find that the petition should be denied because it is without merit.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from a shooting that occurred at the home of Ismael Gomez, Jr., in the city of Norton Shores in Muskegon County. The prosecutor's theory of the case was that the charged offenses occurred after Petitioner and two other men, Gary Ervin and Previn Coleman, went to Gomez' home on the night of November 28, 1999 to collect money. The prosecutor maintained that Petitioner and Ervin were the gunman, while the defense argued that Ervin and Coleman were the gunman. Petitioner was tried before a jury on May 24-26, 2000.[1]

---

[1]The trial transcripts will be referred to as follows:

Tr I    - Trial Transcript Volume I, May 24, 2000 (docket #22)
Tr II   - Trial Transcript Volume II, May 24, 2000 (docket #23)
Tr. III - Trial Transcript Volume III, May 25, 2000 (docket #24)
Tr. IV - Trial Transcript Volume IV, May 26, 2000 (docket #25)
Tr. V  - Trial Transcript Volume V, May 26, 2000 (docket #26)

Ismael Gomez. Jr., was thirty-three years old at the time of trial. (Tr. II, 36.) In November 1999, Gomez lived with his wife, Barbara Gomez, and three children at 2943 Austin in Norton Shores. (Tr. II, 37.) At that time, Gomez' brother, Andreas Ruiz, Jr., also lived with them. (Tr. II, 38.) At about 11:30 p.m. on the night of November 28, 1999, after everyone else had gone to bed, Gomez heard someone ringing the bell at the side door. (Tr. II, 40, 72.) Gomez opened the door because the person outside was making a lot of noise and he did not want the neighbors to be bothered. (Tr. II, 41.) Gary Ervin was at the door. Gomez has been acquainted with Erwin for about ten years, but had not seen him in five or six months. (Tr. II, 41, 80.) Gomez could tell that Ervin had been drinking and told him to quiet down. (Tr. II, 43.) Gomez invited Ervin into the house and they talked in the kitchen. (Tr. II, 42.) Ervin told Gomez that he was in trouble with the law and asked if he could borrow some money. (Tr. II, 43.) Gomez told Ervin that he could not lend him any money. (*Id.*)

As Gomez and Ervin continued to talk, a man opened the door and popped his head in. (Tr. II, 44.) Gomez was surprised because he thought that Ervin was alone. (*Id.*) The man told Ervin to hurry up. (Tr. II, 45.) Ervin introduced the man as his brother or cousin. (Tr. II, 44, 76-79.) Gomez shook hands with the man and then he went back outside. (Tr. II, 45.) Gomez identified Petitioner as the man who came in the door while he was talking to Ervin. (*Id.*) After Petitioner left, Gomez and Ervin began to discuss a low rider truck that Gomez was working on. Gomez showed Ervin some photos of the truck. (Tr. II, 46.) Ervin asked Gomez if they could go outside and show the photos to his brother or cousin. (Tr. II, 46, 82.) When Gomez went outside he saw a man, later identified as Previn Coleman, sitting in the passenger seat of a gray Dodge Stratus. (Tr. II, 47-49.) Gomez had never met Coleman before that night. (Tr. II, 48.) Petitioner was sitting in the passenger seat. (Tr. II, 47.) Petitioner was wearing a dark blue hooded sweatshirt.

(Tr. II, 48.) Gomez walked up to the driver's side window and showed the photos to Coleman. (Tr. II, 50.) After that, Gomez announced that was going back into the house. (Tr. II, 50, 82.)

As Gomez turned around, Ervin grabbed him around the neck with one arm and put a gun to his head with the other. (Tr. II, 50.) Gomez testified that someone said, "[I]t's on," and Petitioner got out of the front passenger door of the car, ran around the front of the car and held a nine millimeter Ruger to Gomez' face. (Tr. II, 51-52, 83.) Ervin walked Gomez back toward the side door of the house. Petitioner walked ahead of them and continued to hold his gun to Gomez' face. (Tr. II, 52-53.) When they reached the doorway, Gomez began struggling with Ervin for control of his gun. (Tr. II, 55-58.) While they were struggling, Ervin's gun discharged one time. (Tr. II, 58.) At the same time, rapid gunfire started coming from just outside the door where Gomez had last seen Petitioner standing. (Tr. II, 56.) Gomez eventually got the gun away from Ervin and was trying to keep Ervin from fleeing when he realized that he was having trouble breathing. (Tr. II, 59.) Gomez called for his brother and told him to get his gun, a .45 caliber Glock. (Tr. II, 59-60.) In the meantime, Ervin broke free from Gomez and ran out the door. (Tr. II, 61.) Gomez was on his knees and could not get up. His wife called 911. (*Id.*)

Gomez spent thirteen days in the hospital. (Tr. II, 62.) During his hospital stay, the police showed him two photographic line-ups. (Tr. II, 62, 87.) Gomez picked Gary Ervin out of the first line-up and Petitioner out of the second line-up. (Tr. II, 63, 86-87.) Gomez recalled picking out Petitioner, but could not recall what he told police officers about Petitioner's role in the incident because he was heavily sedated at the time. (Tr. II, 63, 90-91.) At trial, Gomez testified that he was certain that Petitioner was the man who got out of the passenger side of the car and pointed a gun at him. (Tr. II, 61.) Gomez identified a photograph of a hat that Gary Ervin was wearing and left

by the refrigerator after his struggle with Gomez.  (Tr. II, 70.)  Gomez also identified a photograph

of the Dodge Stratus that was parked outside of his house.  (Tr. II, 71.)

Andreas Ruis testified that he was living with his brother, Ismael Gomez, in

November 1999.  (Tr. III, 149.)  On the night Gomez was shot, Ruis did not hear any gunshots, but

awoke when he heard his brother screaming for Ruis to get his gun.  (Tr. III, 152.)  Ruis testified that

he had a registered .45 caliber Glock.  (Tr. III, 152-53.)  Ruis ran to the kitchen and saw Gomez on

the floor struggling with another man.  (Tr. III, 153.)  Ruis could not see well because he was not

wearing his glasses or contact lenses.  (*Id.*)  Ruis went back to his room and retrieved his gun.  (Tr.

III, 154.)  When he got back to the kitchen, the man was on top of Gomez and was searching through

Gomez' pockets.  (*Id.*)  Ruis could see a lot of blood on the floor.  (Tr. III, 155.)  Ruis realized that

he did not have bullets in his gun and went back to his room again.  (Tr. III, 154.)  By the time he

came back to the kitchen, the man was gone.  When Ruis asked Gomez what happened and Gomez

responded that "Gary" or "Craig" tried to rob him and he got shot.  (Tr. III, 156.)  Ruis jumped in

his car and drove down the road looking for the man, but came back to the house when he saw the

emergency vehicles coming.  (Tr. III, 155.)

Ruis testified that there was gun left on the kitchen table that did not belong to them.

(Tr. III, 159.)  He picked it up and saw that it still had a bullet jammed in it.  (*Id.*)  Ruis did not want

the children to wake up and find the gun in the kitchen, so put it out on the porch for safe keeping

until the police arrived.  (*Id.*)  While Ruis was waiting outside for the emergency responders, he

noticed a bottle of lighter fluid laying on the ground.  (Tr. III, 157.)  Ruis testified that the bottle did

not belong to them.  (*Id.*)

Barbara Gomez, Ismael Gomez' wife, testified that she went to bed at about 10:15

p.m. on the night of November 28, 1999.  She and her husband's bedroom was in the basement.  (Tr.

III, 162.)  She was reading in bed when she heard the doorbell ring.  (Tr. III, 165, 176.)  Barbara recognized Gary Ervin's voice speaking to her husband.  (Tr. III, 165-66.)  She had known Ervin for about seven years and considered him to be a friend.  (*Id.*)  A little while later, Barbara heard a knock at the door and then heard Ervin tell Gomez not to worry because it was just his cousin.  (Tr. III, 167.)  Sometime later Barbara heard some noises upstairs and then heard Gomez yelling for his brother to get his Glock.  (Tr. III, 168-69.)  Barbara also heard five or six gunshots.  (Tr. III, 169-70.)  She heard one shot, followed by a series of four or five shots.  (*Id.*)  The first shot was a lower volume than the second series of shots.  (Tr. III, 170.)  Barbara came out to the bottom of the basement stairs where she could see Gomez down on all fours looking out the side door.  (Tr. III, 172.)  Gomez said that he was shot and told her to call the police.  (Tr. III, 171.)  Barbara came upstairs and called 911.  (Tr. III, 173.)  Ruis came back in the house while Barbara was on the phone with the 911 operator.  (*Id.*)  Barbara testified that Gary Ervin's nickname was "Crack."  (Tr. III, 181.)

Previn Coleman testified pursuant to an agreement with the Muskegon County Prosecutor's Office.  (Tr. III, 186.)  Under the agreement, Coleman would not be prosecuted in connection with this case if he gave truthful testimony at trial.  (Tr. III, 187.)  Coleman was thirty-one at the time of trial.  Coleman testified that he and Petitioner grew up together and were pretty good friends.  (Tr. III, 189.)  Coleman and Gary Ervin are half-brothers.  (*Id.*)  Their father, M.L. Hathorn has the nickname "Cracker Jack and Ervin has the nickname "Little Crack."  (Tr. III, 190.)  On the night of November 28, 1999, Ervin called Coleman and asked him to pick him up.  (Tr. III, 192.)  After Coleman picked up Ervin, Ervin asked him to get in touch with Petitioner.  (Tr. IV, 235, 264.)  Coleman called Petitioner and then went to pick him up.  (Tr. III, 192-95.)  Coleman was

wearing jeans and a shirt. (Tr. III, 197.)  He recalled that Ervin was wearing a hat consistent with

People's Exhibit #19 and Petitioner was wearing a hooded sweatshirt that was consistent with

People's Exhibit #27. (Tr. III, 198.)  Coleman was driving his new Chrysler 300. (Tr. III, 193.)

Coleman testified that the three of them drove around Muskegon Heights in Coleman's car drinking

Martell and talking. (Tr. III, 196, 199, 234.)

Coleman testified that during their conversation in the car, Ervin started saying that

he wanted to go over to the Mexican's house and get some money. (Tr. III, 197.)  They stopped at

Meijer, where Ervin went inside to buy more liquor. (Tr. III, 199.)  Ervin came out of the store with

a bag and got into the back seat. (Tr. III, 200.)  Coleman was driving and Petitioner was in the front

passenger seat. (*Id.*)  After Ervin got back in the car, he told Coleman that he was ready to go over

to the Mexican's house to get the money. (*Id.*)  Coleman assumed that the Mexican owed Ervin

some money. (*Id.*)  Before they went to the Mexican's house, Coleman borrowed a car from Linda

Ray, the mother of his child. (Tr. III, 201-03.)  Her car was a Dodge Stratus. (Tr. III, 201.)

Coleman did not want Ray or her  neighbors to see him taking his friends in Ray's car, so he

dropped off  Ervin and Petitioner at the Sunny Mart near Ray's house and went to get her car. (Tr.

III, 205.)  Coleman did not get Ray's permission to use the car, but planned to return it that night.

(Tr. III, 204.)  Coleman did not want to drive his new car around because he was drinking and if

anything happened, he did not want his car to get damaged. (Tr. III, 203, 238.)  Coleman left his

car parked around the corner from Ray's house. (Tr. III, 206.)  He went back to pick up Ervin and

Petitioner in the Stratus. (*Id.*)

Coleman testified that Ervin directed him to Gomez' house on Austin Street. (Tr. III,

207-08.)  When Coleman pulled in the driveway, Ervin and Petitioner got out of the car and went

up to the side door. (Tr. III, 208-10.) Coleman never got out of the car at Gomez' house. (Tr. III, 212.) He did not pay attention to who went in the house. (Tr. III, 246.) At some point, Ervin and Petitioner came back to the car with Gomez. (Tr. III, 212.) Gomez showed Coleman some photos of a truck that he was fixing up. (Tr. III, 213.) At that point, Petitioner was back in the front passenger seat of the car. (*Id.*) Coleman told Ervin that he was ready to go, but Ervin and Gomez started wrestling and Ervin got Gomez into a headlock. (Tr. III, 214, 249.) Petitioner got out of the car and walked over toward Ervin and Gomez saying, "It's on." (Tr. III, 214.) Coleman testified did not see any guns that night in the car or in the hands of Ervin or Petitioner, although Coleman admitted to telling Detective Ogg that the way Petitioner was holding his hand as he came around the car caused Coleman to think that he had a gun. (Tr. III, 214, 216, 241, 268.)

Coleman testified that he did not want to get involved in the incident, so he got out of the car and ran away. (Tr. III, 215.) He heard gunfire while he was running. (Tr. III, 215-16.) Coleman left the keys in the Stratus so that Ervin and Petitioner would have a means of escape. (Tr. III, 253.) Coleman ran back to his car, which was several miles away. (Tr. III, 217, 226.) While he was on his way, he called his girlfriend, Leisha Kelley. (Tr. III, 217.) Coleman's phone bill confirmed that he made a call to Leisha's number at 11:59 p.m. that lasted five minutes and fourteen seconds. (Tr. III, 216-26.) Coleman called her because he was not sure if he could make it back to his car without a ride. (Tr. III, 223.) Kelley told Coleman that she would come get him. (Tr. III, 226.) Coleman testified that he did not call the police because he did not want to get himself or his friends in trouble. (Tr. III, 254.)

When Coleman found out that Gomez had been injured, he contacted his attorney because he did not want to get in trouble for what had happened. (Tr. III, 228.) Coleman gave a

statement to Detective Ogg.  (*Id.*)  Coleman testified that sometime after Petitioner was charged in this case, petitioner asked Coleman to meet him at a restaurant.  (Tr. III, 229.)  Petitioner told Coleman that he should not testify, and that if he did testify, there was no telling what could happen.  (Tr. III, 230.)  Coleman really did not feel threatened because there was more than one way to take Petitioner's comment.  (Tr, III, 230, 261.)  Coleman testified that he did not do anything wrong that night but did not want to testify at trial without a grant of immunity "just in case."  (Tr. III, 263-64.)

Dr. Charles Willekes testified that he was one of the doctors who treated Gomez after he arrived at Mercy Hospital.  (Tr. III, 318-19.)  Dr. Willekes testified that Gomez suffered a life threatening gunshot wound.  (Tr. III, 321.)  The bullet entered Gomez' upper right flank and went through his abdominal cavity.  (*Id.*)  The bullet narrowly missed the liver, as well as several large blood vessels, and made several passes through the small bowel and the large bowel.  (Tr. III, 322-23.)  The bullet was not found at the time of surgery.  (Tr. III, 324.)

Norton Shores Police Officer Todd Swanker testified that he was dispatched to 2943 Austin, where a shooting had occurred.  (Tr. II, 101.)  The dispatcher advised that the suspect was driving a Dodge Stratus.  (Tr. II, 104.)  While Swanker was en route, he spotted a Dodge Stratus.  Swanker communicated with Officer Rhyndress, who also was in the area, and they planned to stop the car.  (Tr. II, 106.)  The car initially pulled over to the side of the road, but before the officers could get out of their cruisers, the car sped away.  (Tr. II, 109.)  At that point it looked like there were two black men in the front seat of the car.  (Tr. II, 109.)  The car led the officers on a high speed chase through Muskegon Heights.  (Tr. II, 110.)  As they were coming to intersection of Peck and Broadway, the car slowed down and the passenger jumped out of the car and ran into an alley.  (Tr. II, 111.)  Swanker drove down Broadway and turned on Center Street.  He shined his spotlight

into the alley and saw a black male running out of the alley.  Swanker and Sergeant Royce ordered the suspect down at gunpoint and handcuffed him.  (Tr. II, 112.)  The suspect was wearing a Nautica fleece jacket with a square emblem on the back.  (Tr. II, 112-13.)  The suspect was identified as Melvin Williams.  (Tr. II, 114.)  Officer Swanker identified Petitioner as the man that he apprehended.  (*Id.*)

Officer Swanker testified that he read Petitioner his *Miranda* rights.  (Tr. II, 123.) Petitioner told Swanker that he was in the alley drinking a beer and smoking a rock of crack cocaine that he had just purchased at K Discount.  (*Id.*)  Petitioner stated that when he heard the police sirens, he dropped the beer and crack pipe and took off running.  (*Id.*)  Petitioner denied that he had been in the vehicle being chased by the police.  (Tr II, 124.)  Swanker searched the alley and could not find a beer bottle or a crack pipe.  (Tr. II, 124-25.)  Swanker testified that they were unable to identify the driver of the car, but he appeared to be a black male with very short or shaved hair.  (Tr. II, 127.)

Norton Shores Police Sergeant Dan Royce testified that he joined in the pursuit of the Dodge Stratus.  (Tr. II, 132.)  Royce was behind Officer Swanker as he turned westbound on Center Street.  (Tr. II, 133.)  When Royce got out of his cruiser, Swanker had the suspect at gunpoint and was ordering him to the ground.  (Tr. II, 134.)  Royce did not see the suspect's face because he was down on his stomach, but Royce identified People's Exhibit #27 as the jacket that the suspect was wearing.  (Tr. II, 134.)  After the suspect was handcuffed, Royce left to continue the pursuit of the Dodge Stratus.  (Tr. II, 135.)  Ultimately, the driver abandoned the car and fled on foot.  (*Id.*) Royce testified that one bottle of charcoal lighter fluid was found in the victim's driveway and another bottle was found in the road at the corner of Columbia and Continental.  (Tr. II, 96-98; 136.)

- 11 -

Muskegon Heights Police Officer Calvin Davis was on patrol in Muskegon Heights when he heard a call over the radio from a Norton Shores police officer that they were chasing a Dodge Stratus into Muskegon Heights.  (Tr. III 275-76.)  Davis saw the Stratus slow down and then saw a subject who apparently had gotten out of the car and was about two feet away from the car. (Tr. III, 277.)  The subject was wearing a dark hoody with a white square logo on the back.  (*Id.*) The subject ran at full stride eastbound down the alley between Broadway and Center away from Davis' patrol car.  (*Id.*)  Davis circled around in an attempt to cut off the subject, but other officers had already apprehended the subject coming out of the alley.  (Tr. III, 279.)  David identified Petitioner as the person who was apprehended.  (Tr. III, 280-81.)  Davis testified that Petitioner was wearing the same jacket with the logo as the person he saw fleeing the Stratus.  (Tr. III, 280.)

Norton Shores Police Officer Matt Rhyndress testified that he initiated a felony stop of the Dodge Stratus that was suspected in the shooting on Austin Street.  (Tr. IV, 395.) Rhyndress, who had his spotlight on the car when it stopped, could see two black males with very short haircuts in the car.  (Tr. IV, 396, 417.)  Before Rhyndress finished calling in the stop to the dispatcher, the car sped away.  (Tr. IV, 397.)  Rhyndress pursued the car, which was traveling at about 80 miles per hour was and not obeying traffic signs and signals in the residential area.  (Tr. IV, 398-99, 401, 403-404.)  At one point during the chase, Rhyndress saw the front passenger door open and then close.  (Tr. IV, 400.)  Later, as they drove northbound on Peck approaching Center Street, the car slowed down, the front passenger door opened and the passenger bailed out of the car. (Tr. IV, 401.)  The passenger was wearing dark clothing with a white square emblem on the back. (Tr. IV, 402.)  Rhyndress identified People's Exhibit #27 as the sweatshirt that Petitioner was wearing when he bailed out of the car.  (Tr. IV, 414-15.)  Other officers pursued the passenger while

- 12 -

Rhyndress continued to chase the car.  (Tr. IV, 403.)  The car eventually turned southbound on Jefferson.  (Tr. IV, 405.)  When Rhyndress came around the corner, the driver had abandoned the car and left it sitting in the middle of the road.  (*Id.*)  They were unable to find the driver.  (Tr. IV, 406.)

Norton Shores Police Detective Elmer Ogg testified that he was called to the Gomez home after the shooting.  (Tr. III, 287.)  Ogg testified that he located thirteen nine millimeter casings outside on the north side of the house, mostly in the driveway.  (Tr. III, 288.)  He observed eight bullet holes in the outside wall of the house and two more in the door.  (Tr. III, 385-87.)  He could not account for the other three bullets.  (Tr. III, 385-88.)  There were five bullet holes in the inside wall of the house, where the bullets came through from the outside.  (Tr. III, 386-87.)  Ogg testified that the shot pattern was consistent with someone fleeing and shooting at the same time.  (Tr. IV, 390.)  Ogg also observed a small caliber bullet hole in the ceiling.  (Tr. III, 299.)  Ogg collected a plastic container of Meijer lighter fluid and a .25 caliber gun that was found on the front porch.  (Tr. II, 20; Tr. III, 288, 292-93.)  The gun was found loaded, but jammed.  (Tr. III, 293.)  Ogg testified that the crime laboratory determined that the thirteen nine millimeter cartridges found on the side of the house were fired from the same gun.  (Tr. III, 314.)  With regard to the casing from the .25 caliber gun, the crime lab found that it could have been shot by the gun recovered from the front porch, but it could not make a conclusive determination due to the condition of the casing.  (Tr. III, 316.)

Ogg testified that he observed a video surveillance tape from one of the police cruisers that chased the Dodge Stratus and showed Petitioner fleeing from the car, but he could not produce the tape for trial because it accidentally was destroyed.  (Tr. III, 333.)  According to a report

- 13 -

from 911 Central Dispatch, the 911 call from the Gomez residence was made at 11:54 p.m.  (Tr. III, 335.)  The report indicates that the passenger bailed out of the car at midnight and that the driver abandoned the car at 12:05 a.m.  (Tr. III, 335.)

Ogg testified that he participated in the search of the Dodge Stratus.  (Tr. III, 306.)  During the search, he discovered two containers of lighter fluid, a smoke grenade and some gloves.  (Tr. III, 306-10.)  One can of lighter fluid was in a plastic Meijer bag and the other bottle was near a paper Plumb's bag.  (Tr. III, 307.)  Ogg further testified that he observed a security video from the Meijer store in Norton Shores that showed Ervin leaving the store at 9:44 p.m. with a bag that looked like the one found in the car.  (Tr. II, 311-12.)  Police officers lifted two latent finger prints from the Dodge Stratus and lifted another print from the outside of the lighter fluid can, but the crime lab was unable to match the finger print lifts with Petitioner, Ervin or Coleman.  (Tr. III, 330-31.)  The crime lab determined that the smoke cartridge found in the car was operational and could generate sufficient heat to initiate a fire.  (Tr. III, 314.)

Ogg testified that he showed Gomez two separate photographic lineups on November 30, 1999, while Gomez was in the hospital.  (Tr. III, 337, 350-51.)  The first lineup took place in the morning and included a photo of Ervin; the second lineup took place in the afternoon and included a photo of Petitioner.  (Tr. III, 337, 373-74.)  Ogg testified that Gomez was medicated, but seemed aware of what was going on.  (Tr. III, 338.)  Gomez picked Ervin out of the first line-up and explained his involvement in the incident.  (Tr. III, 351.)  During their discussion that morning, Gomez described the driver as a dark-skinned, heavier black man who either was bald or had a very short haircut.  (Tr. III, 374.)  Gomez told Ogg that a man came to the door who Ervin introduced as his brother.  (Tr. III, 352-53.)  That afternoon, Gomez identified Petitioner in the second lineup.  (Tr.

- 14 -

III, 338, 354.) Ogg testified that when Gomez identified Petitioner, he stated "Looks like the driver, dark complexion, beard, heavyset." (Tr. III, 338, 370.)

In the early morning hours following the shooting, Ogg interviewed Petitioner at the Muskegon County Jail. (Tr. III, 342.) After receiving his *Miranda* warnings, Petitioner told Ogg that he was not involved in the shooting and had not been at the scene. (Tr. III, 342, 344.) Petitioner denied that he was in the car that fled from the scene. (TR. III, 344.) Petitioner stated that he had been smoking crack in the alley before his arrest. (Tr. III, 342.) He said that he ate the rock when he saw the police because he did not want to get caught with it. (*Id.*) Petitioner told Ogg that he was taken to the hospital after the shooting and Gomez told the police that Petitioner was not the one doing the shooting. (Tr. III, 343.) Ogg was not aware of any officer who was able to take Petitioner to Mr. Gomez that night for identification purposes. (Tr. III, 343, 350.) One officer attempted to take Petitioner to the hospital, but he was not able to show Petitioner to the victim because he was unconscious. (Tr. III, 343, 350.) Ogg asked to swab Petitioner's hands to be tested for the presence of gun powder. (Tr. IV, 357, 505.) Petitioner initially refused, but he complied after Ogg told him that he really could not refuse. (Tr. IV, 505-506.)

Ogg testified that he interviewed Petitioner again on December 15, at Petitioner's request. (Tr. III, 346.) During the second interview, Petitioner admitted to being present during the incident. (Tr. III, 346.) Petitioner told Ogg that he was the one who went up to the house and was introduced by Ervin to Gomez, but that Coleman was the shooter. (Tr. III, 347.) After the introduction, Petitioner went back to the car and waited. (Tr. III, 347.) Petitioner stated that he saw the struggle between Ervin and Gomez and tried to break it up. (Tr. III, 347.) Petitioner told Ogg that he saw Coleman with a gun and that he tried to stop a robbery from happening. (Tr. IV, 506.)

- 15 -

Petitioner further stated that Coleman drove the car away from the scene with Petitioner.  (Tr. III, 347-48.)  Petitioner also told Ogg that Coleman picked-up the smoke grenade and showed it to him.  (Tr. III, 506.)  Petitioner claimed that he bailed from the car while Coleman was driving.  (Tr. III, 347-48, 506.)  Ogg did not make a recording of the statement because he did not have tape recorder with him.  (Tr. III, 362, 365.)

Petitioner was thirty-two years old at the time of trial.  (Tr. IV, 423.)  Petitioner testified that he received a phone call from Coleman on the night of November 28, 1999.  (Tr. IV, 424.)  Coleman and his brother, Gary, picked up Petitioner at about 10:00 p.m.  (Tr. IV, 425-27.)  Coleman was driving a gray Dodge Stratus that belonged to his girlfriend.  (Tr. IV, 425-26.)  Petitioner testified that he had only met Ervin once or twice before that night.  (Tr. IV, 427, 447.)  The three of them drove around, drinking and talking.  (Tr. IV, 427-28.)  Petitioner testified that Coleman asked him to drive the car because Coleman was tired from being up the night before and had been drinking.  (Tr. IV, 428-29.)  Coleman pulled into a gas station and Petitioner took over as the driver and Coleman moved over to the front passenger seat.  (Tr. IV. 430.)  As they were driving around, Ervin was talking about stopping over at some guy's house.  (*Id.*)  Coleman gave Petitioner directions to the house on Austin Street.  (Tr. IV, 431.)  Petitioner pulled the car up next to the side door.  (*Id.*)  Ervin got out of the car and went to the door.  (Tr. IV, 432.)  A few minutes later, Coleman got out of the car for about a minute.  (*Id.*)  When he came back, he said that his brother would be out in a second.  (*Id.*)

Petitioner testified that Ervin eventually came out of the house with Gomez.  (Tr. IV, 433.)  Petitioner had never seen Gomez before that night.  (*Id.*)  Gomez came up to the car and showed Petitioner some photos of a low rider truck.  (Tr. IV, 434.)  Petitioner and Coleman told

- 16 -

Ervin that they were ready to go.  (Tr. IV, 435.)  The next thing that Petitioner knew, Ervin and

Gomez were struggling and Ervin had Gomez in a headlock.  (*Id.*)  Petitioner could not recall if

Ervin had a gun.  (Tr. IV, 489-90.)  Petitioner testified that Coleman retrieved a pistol from under

the passenger seat and got out of the car.  (Tr. IV, 436.)  Petitioner saw Coleman run around the

front of the car and Ervin, Coleman and Gomez move back toward the house.  (Tr. IV, 436-37.)

Petitioner heard gunshots and ducked down in the car because he did not know who was shooting.

(Tr. IV, 437-38.)  Petitioner testified that Coleman came back to the car, opened the driver's door

and told Petitioner to move over to the passenger side.  (Tr. IV, 438.)  Petitioner moved over to the

passenger seat and Coleman drove the car away from the scene.  (*Id.*)  Coleman pulled into the

Sunny Mart at the end of the street.  (Tr. IV, 439.)  Petitioner kept asking Coleman what was going

on and who was shooting, but Coleman was frantic and just kept saying that he had to get out of

there.  (Tr. IV, 439-40.)  Petitioner testified that Coleman opened his phone while they were in the

car, but he did not see or hear Coleman dial a number or talk to anyone.  (Tr. IV, 465-67.)

Petitioner testified that he and Coleman began to hear sirens and Coleman drove

away from the Sunny Mart. (Tr. IV, 440.)  The police were behind them and turned on their flashing

lights.  (Tr. IV, 441.)  Coleman initially pulled over, but then floored the gas peddle and took off.

(*Id.*)  Petitioner told Coleman to stop and that he wanted to get out of the car, but Coleman was

driving too fast for Petitioner to leave.  (*Id.*)  Eventually, Coleman slowed down enough for

Petitioner to jump out of the car.  (Tr. IV, 441-42.)  Petitioner testified that he had done nothing

wrong, but ran away from the police.  (Tr. IV, 442.)  As he ran down the alley, a police blocked off

the alley and apprehended him.  (*Id.*)  Petitioner testified that he lied to police officers and told them

that he had not jumped out of the car because he did not want to be involved in the incident.  (Tr.

IV, 443.)  He also denied that he had been involved in the shooting incident on Austin Street and claimed that he had been in the alley.  (Tr. IV, 443-44.)  Petitioner admitted that he lied to Officer Swanker when he told him that he was in the alley smoking crack.  (Tr. IV, 456-59.)

Petitioner testified that he was taken to the Muskegon County Jail.  Sometime later that night, Detective Ogg came to interview Petitioner at the jail.  (Tr. IV, 445.)  Petitioner again denied that he had any involvement in the shooting incident because he did not want to be involved.  (Tr. IV, 445-46, 455.)  Petitioned denied telling Ogg that he swallowed a rock of crack cocaine.  (Tr. IV, 465.)  Petitioner also denied that he initially refused Ogg's request to swab Petitioner's hands for gun powder.  (Tr. IV, 446.)  A few days later, Ogg came back and collected the clothing that Petitioner was wearing in the night of the incident.  (Tr. IV, 447.)  Petitioner admitted that he was wearing People's Exhibit #27, a Nautica shirt, on the night of the shooting.  (Tr. IV, 496.)

Petitioner testified that he talked to Ogg again on December 15, the day after Coleman testified in Petitioner's case.  (Tr. IV, 448, 470.)  Petitioner was hurt and disappointed that Coleman had given testimony inculpating Petitioner as the shooter.  (Tr. IV, 471.)  Petitioner could not recall whether he asked for the meeting with Ogg.  (Tr. IV, 470.)  Ogg read Petitioner his *Miranda* warnings and Petitioner agreed to talk to Ogg.  (Tr. IV, 448.)  According to Petitioner, the meeting was very brief, only about a minute.  (Tr. IV, 451, 471.)  Petitioner told Ogg that he was at the scene, but Coleman, not Petitioner, was the shooter.  (Tr. IV, 450-51, 472-73.)  At trial, Petitioner admitted that he implicated Coleman as the shooter, but testified that he did not actually see Coleman shoot the gun.  (Tr. IV, 473.)  Petitioner denied telling Ogg that he got out of the car and went up to the house and met Gomez while Ervin was still inside.  (Tr. IV, 474, 485.)  Petitioner testified that before his last meeting with Detective Ogg, he contacted Coleman and told him that

- 18 -

he was under pressure to give police the details of Coleman's involvement in the shooting.  (Tr. IV, 451.)  Petitioner denied that he owned a nine millimeter gun or possessed a gun on the night of the shooting.  (Tr. IV, 486.)  Petitioner also denied that he planned to commit a robbery that night or possessed a smoke bomb or lighter fluid.  (Tr. IV, 453, 482, 496.)

Leisha Kelley testified as a rebuttal witness over the objection of defense counsel. Kelley testified that she had known Coleman for her entire life and started dating him in 1999.  (Tr. IV, 514.)  Coleman called Kelley at around midnight on November 28, 1999.  (Tr. IV, 515.)  They talked for about five minutes.  (*Id.*)  About fifteen minutes later, Coleman called her again and they talked for about a minute.  (Tr. IV, 517.)  Kelley called Coleman later that night when she arrived in Muskegon.  (*Id.*)

At the conclusion of trial, on May 26, 2000, the jury found Petitioner guilty of assault with intent to commit murder, assault with intent to commit armed robbery, discharging a firearm in a dwelling, and two counts of felony-firearm.  (Tr. V, 89-90.)  On August 3, 2000, the trial court sentenced Petitioner as a fourth habitual offender, to prison terms of 25-40 years for each assault conviction, 2-15 years for discharging a firearm in a dwelling, together with consecutive 2-year prison terms for each of the felony firearm convictions.  (Sentencing Transcript, 14-15, docket #28.)        B.    **Direct Appeal**

Petitioner filed a delayed application for leave to appeal in the Michigan Court of Appeals. His brief, which was filed by counsel on August 22, 2001, raised the following three claims of error:

I.    DEFENDANT'S DUE PROCESS RIGHTS TO A FAIR TRIAL, TO PREPARE A DEFENSE, AND TO FULL DISCOVERY WERE VIOLATED WHEN OVER OBJECTION THE COURT ADMITTED A STATEMENT ALLEGEDLY WRITTEN BY MR. WILLIAMS TO THE OFFICER IN CHARGE WHICH WAS UNDISCLOSED TO DEFENSE COUNSEL UNTIL THE DAY THAT TRIAL COMMENCED.

- 19 -

II.     MR. WILLIAMS RECEIVED THE INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL FOR COUNSEL'S FAILURE TO PURSUE MEANINGFUL DISCOVERY AND FOR FAILING TO SEEK AN ADJOURNMENT WHEN CRITICAL EVIDENCE OF A STATEMENT MADE BY MR. WILLIAMS WAS DISCLOSED ON THE FIRST DAY OF TRIAL.

III.    THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTOR TO CALL A REBUTTAL WITNESS TO OFFER TESTIMONY ON AN IRRELEVANT AND COLLATERAL MATTER TO TRIAL.

(*See* Def.-Appellant's Br. on Appeal, docket #29.)   The Michigan Court of Appeals denied Petitioner's application for leave to appeal for lack of merit in the grounds presented.  (*See* 1/24/97 Mich. Ct. App. Ord., docket #29.)

Petitioner filed an application for leave to appeal to the Michigan Supreme Court raising the same three claims raised before and rejected by the Michigan Court of Appeals.  By order entered April 29, 2002, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* 4/29/02 Mich. Ord., docket #30.)

Petitioner timely filed this habeas corpus action on or about April 21, 2003.  Since the Court found that his petition contained both exhausted and unexhausted claims, this Court issued a stay on October 8, 2003, so that Petitioner could pursue his unexhausted claims in the state courts.

C.      **Post-conviction relief**

On August 27, 2003, Petitioner filed a motion for relief from judgment under MICH. CT. R. 6.500 *et seq.*, raising five new claims of error.  The Muskegon County Circuit Court denied the motion on December 5, 2003.  Petitioner filed an applications for leave to appeal in the Michigan Court of Appeals and the Michigan Supreme Court.  The Michigan Court of Appeals and the

- 20 -

Michigan Supreme Court denied his applications on June 24, 2005 and November 29, 2005, respectively, because Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).   (*See* 6/24/05 Mich. Ct. App. Ord, docket #31; 11/29/05 Mich. Ord., docket #32.)

Following the conclusion of the proceedings on his motion for relief from judgment, Petitioner filed an amended habeas petition in this case.  His petition included the five claims that he raised in his motion for relief from judgment and three claims that he raised on direct appeal.  On April 25, 2006, the Court lifted the stay and ordered service of the amended petition.

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and

not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be  instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at

- 22 -

411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).  Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316.  The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943.  However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer."  In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial

court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

I.    **Sufficiency of the Evidence: Ground 1**[2]

Petitioner contends that the prosecutor failed to present sufficient evidence to sustain his convictions for assault with intent to commit murder, assault with intent to commit armed robbery, discharging a firearm in a dwelling and two counts of felony firearm. Specifically, Petitioner contends that the prosecutor failed to satisfy the "specific intent" requirement for those offenses.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues

---

[2]Respondent contends that Petitioner's first five grounds for habeas corpus relief are procedurally defaulted because they were rejected by the state appellate courts pursuant to MICH. CT. R. 6.508(D). The Sixth Circuit has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999). Consequently, the Court will address the merits of Petitioner's claims.

of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

A.     Assault with Intent to Commit Murder

Under Michigan law, the elements of assault with intent to commit murder are: (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder. *People v. Brown*, 703 N.W.2d 230, 236 (Mich. Ct. App. 2005) (internal quotations marks and citation omitted). Issues of witness credibility are for the jury, *People v. Lemmon*, 576 N.W.2d 129, 134 (Mich. 1998), and the jury may draw reasonable inferences from the evidence, *People v. Hardiman*, 646 N.W.2d 158 (Mich. 2002); *People v. Reddick*, 468 N.W.2d 278, 280 (Mich. Ct. App. 1991). It is the role of the jury to determine what inferences can be drawn and the weight to afford them. *Hardiman*, 646 N.W.2d at 165.

At trial, Gomez identified Petitioner as the man who came up to the house while he was in the kitchen talking to Ervin. (Tr. II, 44-45.) Ervin introduced Petitioner as his brother or cousin and Petitioner shook hands with Gomez and went back outside. (Tr. II, 44-45, 76-79.) After Petitioner left, Gomez and Ervin began to discuss a low rider truck that Gomez was working on. Gomez showed Ervin some photos of the truck. (Tr. II, 46.) Ervin asked Gomez if they could go outside and show the photos to his brother or cousin. (Tr. II, 46, 82.) When Gomez went outside he saw a man, later identified as Previn Coleman, sitting in the driver's seat of a gray Dodge Stratus. (Tr. II, 47-49.) Gomez testified that he was certain that Petitioner was sitting in the passenger seat.

- 25 -

(Tr. II, 47-48.) According to Gomez, Coleman was wearing a leather jacket and Petitioner was wearing a dark blue hoody. (Tr. II, 48.) Gomez walked up to the driver's side window and showed the photos to Coleman. (Tr. II, 50.)

Gomez testified that when he announced that was going back into the house, Ervin grabbed him around the neck with one arm and put a gun to his head with the other. (Tr II, 50, 82.) Gomez testified that someone said, "[I]t's on," and Petitioner got out of the front passenger door of the car, ran around the front of the car and held a nine millimeter Ruger to Gomez' face. (Tr. II, 51-52, 83.) As Ervin walked Gomez back toward the side door, Petitioner walked ahead of them and continued to hold his gun to Gomez' face. (Tr. II, 52-53.) When they reached the doorway, Gomez began struggling with Ervin for control of his gun. (Tr. II, 55-58.) While Gomez was struggling with Ervin, rapid gunfire started coming from just outside the door where Gomez had last seen Petitioner standing. (Tr. II, 56.) Gomez testified that there was no question in his mind that Petitioner was the man who got out of the passenger side of the car and held a nine millmeter gun to his face. (Tr. II, 52, 61.)

Coleman testified that Ervin and Petitioner went up to the house together and came out of the house sometime later with Gomez. (Tr. III, 208-212.) Petitioner got back into the front passenger seat of the car. (Tr. III, 213.) Coleman testified that when Ervin started wrestling with Gomez, Petitioner got out of the car and walked over toward Ervin and Gomez saying, "It's on." (Tr. III, 214.) Coleman testified did not see any guns that night in the car or in the hands of Ervin or Petitioner, although Coleman admitted to telling Detective Ogg that the way Petitioner was holding his hand as he came around the car caused Coleman to think that he had a gun. (Tr. III, 214, 216, 241, 268.)

- 26 -

During his trial testimony, Petitioner admitted that he was at Gomez' house with Ervin and Coleman when the shooting occurred.  (Tr. IV, 431-40.)  He also admitted that he was in the front passenger seat of the Dodge Stratus when it was chased by police and that he bailed out of the car.  (Tr. IV, 438-442.)   Petitioner further admitted that he lied to police when he initially told them that he was not involved in the shooting incident and had been in the alley smoking crack. (Tr. IV, 443-44, 455-59.) Petitioner testified that during an interview on December 15, 1999, he first told Ogg that he was present during the shooting, but implicated Coleman as the shooter.  (Tr. IV, 450-51, 472-73.)  At trial, Petitioner maintained that only Ervin and Coleman got out of the car while they were at the Gomez residence.  (Tr. IV, 432-33.)

Detective Ogg testified that during his interview with Petitioner on December 15, 1999, Petitioner admitted to being present during the shooting.  (Tr. III, 346.)  Petitioner told Ogg that he was the person who went up to the house and was introduced by Ervin to Gomez.  (Tr. III, 347.)  Ogg further testified that he located thirteen nine millimeter casings outside on the north side of the house, mostly in the driveway.  (Tr. III, 288.)  He observed eight bullet holes in the outside wall of the house and two more in the door.  (Tr. III, 385-87.)  He could not account for the other three bullets.  (Tr. III, 385-88.)  There were five bullet holes in the inside wall of the house, where the bullets came through from the outside.  (Tr. III, 386-87.)  Ogg testified that the shot pattern was consistent with someone fleeing and shooting at the same time.  (Tr. IV, 390.)  It is undisputed that Gomez was struck by a bullet and sustained life-threatening injuries.

In light of the above evidence, the jury could reasonably infer that Petitioner fired a nine-millimeter gun into Gomez' home, striking Gomez, thus satisfying the first and third elements of the offense.  It is well established under Michigan law that a jury may infer an intent to kill from

any facts in evidence, including the use of a deadly weapon.  *See People v. Dumas*, 563 N.W.2d 31, 36-37 (Mich. 1997); *People v. DeLisle*, 509 N.W.2d 885, 893 (Mich. Ct. App. 1993); *People v. Turner*, 233 N.W.2d 617, 619 (Mich. Ct. App. 1975).  Thus, the jury could infer an intent to kill from the evidence that Petitioner's use of a gun.  Accordingly, the prosecutor presented sufficient evidence to support Petitioner's conviction for assault with intent to murder.

B.      Discharging a Firearm at a Dwelling

The above evidence also is sufficient to support Petitioner's conviction for discharging a firearm at a dwelling.  The elements of discharging a firearm at a dwelling are: (1) the defendant intentionally discharged a firearm; (2) the firearm was discharged at a dwelling; and (3) the defendant knew or had reason to believe when he discharged the firearm that the facility was a dwelling.  *People v. Dillard*, No. 199977, 1998 WL 1989812, at *2 (Mich. Ct. App. Sept. 11, 1998).  The jury could reasonably infer from the evidence that Petitioner intentionally fired approximately thirteen shots at the Gomez residence, thus satisfying the elements of the offense.

C.      Assault with Intent to Commit Armed Robbery

The elements of assault with intent to commit armed robbery are: (1) an assault with force and violence; (2) an intent to rob and steal; and (3) defendant's being armed.  *People v. Federico*, 381 N.W.2d 819, 826 (Mich. Ct. App. 1985).  As discussed above, the prosecutor presented sufficient evidence from which the jury could infer that Petitioner fired numerous shots at the Gomez residence, striking the victim, thereby satisfying the first and third elements of the offense.  The prosecutor presented evidence that Ervin and Petitioner intended to rob Gomez. Coleman testified that Ervin made several statements in the car that he wanted to go over to "the Mexican's" house and get some money.  (Tr. III, 197, 200.)  Gomez testified that while he and Ervin

- 28 -

were taking in the kitchen, Ervin told him that he was in trouble with the law and asked to borrow some money, but Gomez declined.  (Tr. III, 43.)  Gomez testified that someone said, "It's on," when Ervin put him in a headlock and Petitioner got out of the car and held a gun to his face.  (Tr. II, 51-52, 83.)  Ervin and Petitioner then acted together to guide Gomez back to the house at gunpoint.  (Tr. II, 52-53.)  Coleman also testified that Petitioner said, "It's on," as he got out of the car.  (Tr. III, 214.)  Gomez' brother, Adreas Ruis, testified that during the struggle on the kitchen floor, Ervin got on top of Gomez and was searching through Gomez' pockets.  (Tr. III, 154.)  After Ervin left, Gomez told Ruis that Ervin tried to rob him.  (Tr. III, 156.)  Detective Ogg testified that during his December 15, 1999 interview with Petitioner, Petitioner stated that he saw Coleman with a gun and tried to stop a robbery from happening.  (Tr. III, 347-48; Tr. IV, 506.)  From this evidence, the jury could reasonably infer that Ervin and Petitioner intended to rob Gomez, thus satisfying the second element of the offense.

### D.   Felony-Firearm

In addition, the prosecutor presented sufficient evidence from which the jury could find Petitioner guilty of felony-firearm.  The offense of felony-firearm consists of two essential elements: (1) the possession of a firearm (2) during the commission of, or the attempt to commit, a felony. MICH. COMP. LAWS § 750.227b(1); *People v. Avant*, 597 N.W.2d 864, 869 (Mich. Ct. App. 1999).  The evidence discussed above clearly supports the jury's finding that Petitioner was in possession of a weapon when he committed or attempted to commit the felony offenses of assault with intent to murder and assault with intent to commit armed robbery.

- 29 -

II.  **Prosecutor's Reliance on Perjured Testimony: Ground 2**
     **Admission of Rebuttal Testimony: Ground 8**

In his second ground for habeas relief, Petitioner contends that his due process rights were violated when the prosecutor intentionally used perjured testimony to convict him.  Petitioner makes the following specific allegations:  "In the present case, Petitioner has discovered that Coleman and Ms. Kelley's testimony is in direct conflict with phone records that she did not pick up [the] phone.  Phone records of incoming and outgoing calls reveal[] that there was no phone conversations between Coleman and Kelley."  (Mem. in Support of Pet., 13.)  The knowing use of perjured testimony, including the failure to correct false testimony, constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.  *Napue v. Illinois*, 360 U.S. 264, 272 (1959); *Foley v. Parker*, 488 F.3d 377, 392 (6th Cir. 2007).  This includes the use of testimony, whether elicited or left uncorrected, that the prosecutor knows or should know is false.  *Id.* (citing *Giglio v. U.S.*, 405 U.S. 150, 153-54 (1972)).

The testimony at issue concerns phone calls that Coleman made to his girlfriend, Leisha Kelley very close to the time of the shooting at the Gomez residence.  The 911 call from the Gomez residence was made at 11: 54 p.m., Petitioner bailed from the Dodge Stratus at midnight and the car was abandoned at 12:05 a.m.  (Tr. III, 335.)  Petitioner testified that he and Coleman fled the scene in the Dodge Stratus, while the prosecution maintained that Coleman left on foot just before the shooting occurred and it was Petitioner and Ervin who fled in the Dodge Stratus.  Coleman testified that he ran back his car, which was several miles away.  (Tr. III, 217, 226.)  While he was on his way, he called his girlfriend, Leisha Kelley, because he was not sure if he could make it back to his car without a ride.  (Tr. III, 217, 223.)  A copy of Coleman's phone bill (People's Exhibit #30), shows a call to 616-785-7011 at 11:59 p.m. that lasted five minutes and fourteen seconds.  (Tr.

- 30 -

III, 217-26; Pet. Appendix C, docket #11-15).  Coleman testified that he tried to called Kelley again about fifteen minutes later, but she did not answer.  (Tr. III, 225.)  Over the objection of the defense, Kelley testified on rebuttal that Coleman called her at around midnight on November 28, 1999.  (Tr. IV, 515.)  They talked for about five minutes.  (Tr. IV, 515.)  She further testified that about fifteen minutes later, Coleman called her again and they had a very short conversation of less than a minute. (Tr. IV, 517.)

In light of the record, it is difficult to decipher the basis of Petitioner's claim. People's Exhibit #30, which was provided by Petitioner, shows that Coleman made a call to Kelley's number at 11:59 p.m. that lasted five minutes and fourteen seconds.  (Pet. Appendix C, docket #11-15.)  Petitioner does not appear to dispute the content of the phone records.  Petitioner may be referring to the second phone call from Coleman to Kelley, which Coleman testified that Kelley did not answer, but Kelley testified that she did answer and they talked for less than a minute.  (Tr. III, 225; Tr. IV, 517.)  The telephone records show a call to Kelley's number at 12:13 a.m. for one minute, which appears to be the minimum charge when a call is placed.  Assuming that either Coleman or Kelley gave mistaken or false testimony on that point, there is no reasonable likelihood that such incorrect testimony could have affected the judgment of the jury. *Napue*, 360 U.S. at 272; *Foley*, 488 F.3d at 392.  Kelley's testimony that she answered the second call simply was not a matter of significance to the issue of Petitioner's guilt or innocence, and Petitioner's due process rights were not violated.

Petitioner further claims in Ground 8 that the trial court erred by allowing the prosecution to call Leisha Kelley as a rebuttal witness.  The prosecutor offered Kelley's testimony regarding her phone conversation with Coleman to rebut Petitioner's testimony that Coleman drove away in the Dodge Stratus with Petitioner after the shooting occurred.  (Tr. IV, 438.)  According to

Petitioner, Coleman pulled into the Sunny Mart at the end of the street.  (Tr. IV, 439.)  While they were stopped, Coleman opened his phone, but Petitioner testified that he did not hear Coleman dial a number or talk to anyone.  (Tr. IV, 465-67.)  Petitioner contends that Kelley's testimony was irrelevant evidence that was used to impeach Petitioner on a collateral matter in violation of his right to due process and a fair trial.  Petitioner relies exclusively on state law in claiming that Kelley's testimony constituted improper impeachment on a collateral matter.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

The admission of Kelley's rebuttal testimony clearly did not result in the denial of fundamental fairness.  As stated by Petitioner, Kelley's testimony was collateral to the issue of Petitioner's guilt or innocence in this case.  Petitioner, therefore, fails to raise a cognizable federal claim.

III.   **Ineffective Assistance of Trial Counsel: Ground 3**
       **Ineffective Assistance of Appellate Counsel: Ground 4**

In his third ground for habeas relief, Petitioner claims that his trial counsel was ineffective for failing to object to the prosecutor's failure to produce sufficient evidence to sustain the jury's verdict on the charged offenses and failing to object to the prosecutor's use of perjured evidence.

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1).  *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

- 33 -

I concluded above that the prosecutor presented sufficient evidence to support Petitioner's convictions.  I also previously found that Petitioner's due process rights were not violated by the prosecutor's use of allegedly perjured evidence.  Counsel's failure to make a meritless objection in these respects does not constitute ineffective assistance of counsel.  *See Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir.1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978).  There is simply no basis on these allegations to find that Petitioner's trial counsel was ineffective.

Petitioner further claims in Ground 4 that his appellate counsel is ineffective for failing to raise Grounds 1 and 2 on direct appeal.

An appellant has no constitutional right to have every non-frivolous issue raised on appeal.  "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688.  As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2002).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* at 289.

As previously discussed, Petitioner's first two grounds for habeas corpus relief are without merit.  Thus, appellate counsel was not ineffective for failing to raise them on direct appeal.

*See Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal).  Petitioner, therefore, cannot establish a claim of ineffective assistance of trial or appellate counsel.

IV.    **Rejection of Petitioner's Motion for Relief From Judgment under MICH. CT. R. 6.508(D): Ground 5**

Following his direct appeal, Petitioner filed a motion for relief from judgment under MICH. CT. R. 6.500 *et seq.*, raising five new claims of error.  The Muskegon County Circuit Court denied the motion on December 5, 2003.  Petitioner filed an applications for leave to appeal in the Michigan appellate courts.  The Michigan Court of Appeals and the Michigan Supreme Court denied his applications on June 24, 2005 and November 29, 2005, respectively, because Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (*See* 6/24/05 Mich. Ct. App. Ord, docket #31; 11/29/05 Mich. Ord., docket #32.)  Under MICH. CT. R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal.  For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand."  MICH. CT. R. 6.508(D)(3)(a)-(b).

In his application for habeas corpus relief, Petitioner disputes the finding of the state courts that he failed to established the requisite cause and prejudice for purposes of MICH. CT. R. 6.508(D).  The federal courts may issue a writ of habeas corpus to release a state prisoner only on the ground that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. §§ 2241(c), 2254(a).  The federal courts have no power to intervene on the basis of a

perceived error of state law.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987) ("The federal habeas court does not act as an additional state appellate court to review a state court's interpretation of its own law or procedure.").  Petitioner's attack on the state court's application of MICH. CT. R. 6.508(D) purely is a matter of state law.  Consequently, Petitioner's claim is not cognizable for purposes of federal habeas corpus review.

Moreover, rather then relying on his state-court default, this Court has addressed the merits of the claims presented in Petitioner's motion for relief from judgment.  Petitioner, therefore, has not suffered any prejudice in these habeas corpus proceedings resulting from the state court's rejection of Petitioner's claims pursuant to MICH. CT. R. 6.508(D).

### V.  Admission of Petitioner's December 15, 1999 Statement: Ground 6 Ineffective Assistance of Counsel: Ground 7

On the first day of trial, defense counsel informed the trial court that he had just learned about a statement that Petitioner made to Detective Ogg on December 15, 1999.  (Tr. I, 4.) Detective Ogg made notes of the conversation, which he later transcribed.  (Tr. III, 508.)  The prosecutor explained to the court that no discovery order was in place, but it was the policy of the prosecutor's office to provide all relevant materials to the defense.  (Tr. I, 5.)  The prosecutor, who was substituted in the case approximately two weeks before trial, believed that the defense had a copy of the statement.  (*Id.*)  The trial court ruled that there was no violation of a discovery order, and, thus, no ground to exclude the statement.  (Tr. I, 8.)  Nevertheless, the Court offered to adjourn the trial for as long as necessary for the defense to prepare its case.  (*Id.*)  After consulting with Petitioner, defense counsel advised the trial court that they would proceed with the trial as scheduled.  (Tr. I, 18.)

With regard to the December 15 interview, Ogg testified that Petitioner admitted to being present during the incident. (Tr. III, 346.) Petitioner told Ogg that he was the one who went up to the house and was introduced by Ervin to Gomez, but that Coleman was the shooter. (Tr. III, 347.) After the introduction, Petitioner went back to the car and waited. (Tr. III, 347.) Petitioner stated that he saw the struggle between Ervin and Gomez and tried to break it up. (Tr. III, 347.) Petitioner told Ogg that he saw Coleman with a gun and that he tried to stop a robbery from happening. (Tr. IV, 506.) Petitioner further stated that Coleman drove the car away from the scene. (Tr. III, 347-48.) Petitioner admitted that he bailed from the car while Coleman was driving. (Tr. III, 347-48, 506.) Ogg testified that Petitioner told him during the interview that Coleman showed him a smoke grenade in the car. (Tr. III, 506.) Petitioner also told Ogg that he smoked a cigarette while he was sitting in the back seat of the car and left the butt. (Tr. III, 507.) Ogg testified that they found a smoke bomb and a cigarette butt during the search of the Dodge Stratus. (Tr. III, 306-10, 507.)

Petitioner testified that during the December 15 interview, he told Ogg that he was at the scene but Coleman was the shooter. (Tr. IV, 450-51, 472-73.) Petitioner admitted that he implicated Coleman as the shooter during the interview with Ogg, but he testified that he did not actually see Coleman shoot the gun. (Tr. IV, 473.) Petitioner testified that Coleman drove the car away after the shooting, while Petitioner sat in the passenger seat. (Tr. IV, 438.). Petitioner further testified that he bailed out of the car during the high-speed chase. (Tr. IV, 441-42.) Petitioner denied telling Ogg that he got out of the car and went up to the house and met Gomez while Ervin was still inside. (Tr. IV, 450, 474, 485.) He also denied telling Ogg that he tried to stop a robbery from happening, smoked a cigarette in the car or saw a smoke grenade in the car. (Tr. IV, 474.)

- 37 -

Petitioner claims in Ground 6 that the trial court violated his due process rights by allowing admission of Detective Ogg's testimony regarding his interview with Petitioner on December 15, 1999. He argues that the late disclosure of the prosecutor's intent to use this statement seriously undermined his defense and prejudiced him at trial. As discussed above, the decision of the trial court to admit certain evidence only can be the basis for habeas corpus relief if it rendered the trial fundamentally unfair. *Estelle*, 502 U.S. at 70; *Seymour*, 224 F.3d at 552.

Petitioner was not denied a fair trial by the late disclosure of his own statement. Petitioner admitted that he talked to Ogg on December 15, 1999. Petitioner further admitted that during the conversation, he told Ogg that he was present during the incident and implicated Coleman as the shooter. (Tr. IV, 450-51, 472-73.) Those admissions were entirely consistent with the defense theory that Petitioner was at the scene, but Ervin and Coleman were the gunmen. While there were some discrepancies in Ogg's and Petitioner's testimony regarding what was said during the interview, they were not significant enough to deprive Petitioner of a fundamentally fair trial. Moreover, the prosecutor did not violate a discovery order because none had been entered. Also, the lateness of the disclosure was ameliorated by the court's offer to give Petitioner a continuance, which he declined. Accordingly, the admission of Detective Ogg's testimony regarding his December 15, 1999 interview with Petitioner did not violate Petitioner's due process rights.

In Ground 7, Petitioner also claims that the trial counsel was ineffective for not seeking an adjournment after the statement was disclosed on the first day of trial. The record shows that counsel discussed the matter with Petitioner before informing the Court that they would proceed with the trial. Petitioner did not express any dissatisfaction with counsel's decision to go forward

- 38 -

with the trial.  Furthermore, Petitioner does not allege why an adjournment was necessary.  As discussed above, Petitioner was aware of his conversation with Ogg and the key admissions that he made during the interview were consistent with the defense theory.  Ogg was available at trial for cross-examination regarding the December 15, 1999 interview with Petitioner.  Consequently, counsel's decision not to seek an adjournment did not fall below an objective standard of reasonableness.  Where counsel's performance did not fall below an objective standard of reasonableness, the court need not reach the question of prejudice.  *See Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (citing *Strickland*, 466 U.S. at 697).  Nevertheless, I concluded above that Petitioner was not prejudiced by the admission of the evidence.  Petitioner, therefore, is not entitled to habeas relief on his claim of ineffective assistance of counsel.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  May 14, 2009                              /s/ Hugh W. Brenneman, Jr.
                                                  HUGH W. BRENNEMAN, JR.
                                                  United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).